NOT FOR PUBLICATION (Doc. No. 9)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| ELANA PETERSON FORD, | : |
| Plaintiff, | : |
| | : Civil No. 10-4781 (RBK) |
| v. | : |
| | : **OPINION** |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | : |
| Defendant. | : |

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal filed by Plaintiff Elana Peterson Ford from the decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff disability insurance benefits ("DBI") pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g).  Plaintiff also filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the reasons expressed below, Plaintiff's motion for summary judgment is denied, and the Court will reverse the Commissioner's decision that Plaintiff is not entitled to DBI and remand the matter to the Administrative Law Judge ("ALJ").

**I.   BACKGROUND**

  **A. Procedural History**

Plaintiff filed an application with the Social Security Administration (the "Administration") for DBI on February 7, 2007.  (Tr. 10).  Plaintiff claimed that she became disabled on January 6, 2006.  (Id.).  The Administration initially denied her claim on June 6,

1

2007, and then denied her claim again upon reconsideration. (Id.). Thereafter, Plaintiff filed a written request for a hearing before an ALJ. (Id.). Plaintiff appeared with counsel at a hearing and testified before the ALJ. (Id.). The ALJ issued a decision denying Plaintiff's claim. (Tr. 7-16). On August 31, 2009, Plaintiff filed a request for review by the Appeals Council. The Appeals Council denied Plaintiff's request for review. (Tr. 1-5). As a result of that denial, Plaintiff filed this action in September 2010. (Doc. No. 1).

### B. Plaintiff's Medical History

Plaintiff is a thirty-four year old woman with a high school diploma, who attended college for an unspecified period of time. (Tr. 24). In her testimony before the ALJ, Plaintiff claimed that she sustained a back injury during her employment with Mediplex in March 1999. While employed by Mediplex, Plaintiff performed a variety of custodial tasks such as cooking meals, mopping floors, washing dishes, and lifting items that weighed at least twenty pounds. (Tr. 25). Despite her alleged back injury in 1999, Plaintiff worked for the State of New Jersey in a clerical or secretarial position between 2001 and 2006.[1] (Tr. 25). During her employment with the State of New Jersey, Plaintiff typed reports, scheduled meetings and training, answered phones, compiled training packages, and filed documents. (Tr. 138).

Plaintiff resigned from her employment with the State of New Jersey in 2006. At the time of her resignation, Plaintiff informed her employer that she could not work because she could not find anyone to care for her children. (Tr. 28). However, during the ALJ hearing, Plaintiff admitted that she "bended the truth some," and that the true reason for her resignation was that she could not perform her clerical and/or administrative duties. (Id.). Specifically,

---

[1] Plaintiff's disability application is inconsistent with her testimony at the ALJ hearing. Plaintiff testified that she worked for five years in a clerical position for the State of New Jersey. (Tr. 25). Plaintiff's disability application states that she worked for the State of New Jersey between 1989 and 2006. (Tr. 138).

Plaintiff testified, "I told [my employer] that I couldn't return to work because I couldn't find no one to watch my kids when the truth was I was scared to tell them that I could not perform my work duties." (Id.).

At the ALJ hearing, Plaintiff provided a variety of explanations for her inability to perform clerical and administrative work. Plaintiff claimed that she could not perform that work for the State of New Jersey, or any other employer, because she had difficulty getting out of bed in the morning. (Tr. 27). Plaintiff also claimed that "[a]t times [she] ha[d] to take medication just to get out of bed to relieve the pain in [her] back and [her] wrists and, [her] legs." (Id.). In addition, Plaintiff claimed that "sitting at a desk all day long . . . [caused her] radiating pain," and claimed that she experienced a mental disorder as a result of her symptoms. (Id.).

Prior to her employment with the State of New Jersey, Plaintiff held a variety of other positions. For example, for a period of two to three years, she worked at Subway making sandwiches, operating a cash register, and baking bread. (Tr. 26). In addition, Plaintiff worked at Roy Rogers performing tasks similar to those she performed during her employment with Subway. (Id.). Finally, Plaintiff worked in a clerical position at Virtua Hospital for six months. (Id.).

In 2009, Plaintiff lived with her husband, and her four children. At the time of her ALJ hearing, she had two daughters and two three-year old twin sons. (Tr. 29). Before Plaintiff became pregnant with her two sons, she was informed that having children would exacerbate her back problems. (Id.). However, Plaintiff testified that she became pregnant with her two sons because her husband wanted to have more children. (Tr. 36). Plaintiff gave birth to her two sons in June 2007. (Tr. 29).

3

Plaintiff requires substantial assistance to perform daily tasks. Her husband does a majority of the chores in her household such as washing clothes and shopping. (Tr. 34). Her mother and daughters clean her home. (Id.). Her husband also helps her with a variety of personal tasks such as showering, applying lotion, dressing, and ironing her clothes. (Id.). Plaintiff's sister washes and styles her hair. (Id.).

Plaintiff spends a majority of her time lying idly around her home, watching television, and reading books. (Tr. 35). On occasion, Plaintiff picks up toys in her house or makes a sandwich. (Tr. 37). Plaintiff claims that she has difficulty performing tasks such as squeezing rags and putting mayonnaise on bread due to pain in her wrist. (Tr. 36-37). In addition, Plaintiff claims that she cannot do laundry or bend to wash herself in the shower. (Tr. 37). Plaintiff claims that when she sits on the toilet she needs help standing up. (Id.). Plaintiff also claims that she no longer attends church services because her back hurts when she sits in the pews. (Id.).

In addition to her physical ailments, Plaintiff claims that she suffers from a mental disorder. Specifically, Plaintiff testified that she has difficulty thinking, concentrating, and remembering. (Tr. 39). She claims that she is "always concentrating on . . . how [her] life was before [she] was injured." (Id.). She also complains that her mental problems are so severe that she "can't even be a wife to [her] husband . . . ." (Id.).

Plaintiff testified that she takes Vicodin, Ultram, and Naproxen to help her cope with the pain caused by her injury. (Tr. 32). Plaintiff began taking Tramadol for her symptoms in 1999, and added Vicodin and Ultram as her symptoms worsened. (Id.).

Finally, Plaintiff claimed that she suffers from "chronic back pain" and a "right knee restriction" as a result of her injury in 1999. (Tr. at 23). Moreover, Plaintiff's disability application states that during a seven-hour workday she could walk for two hours, stand for two

hours, and sit for one hour. (Tr. 138). Her disability application also states that she could lift twenty-five pounds occasionally and fifteen pounds frequently. (Id.). However, during the ALJ hearing, Plaintiff testified that she had difficulty typing, and could not remain at her desk during her employment with the State of New Jersey. (Id.). Plaintiff also testified that she constantly took medications to "deal with the pain" and claimed that her managers were frustrated because she could not perform all of her clerical duties. (Id.).

    **C. Medical Examinations**

Plaintiff underwent a variety of medical examinations between January 2006 and May 2009. In April 2007, Dr. Steven M. Reich examined Plaintiff. (Tr. 224). At the time, Plaintiff complained of numbness, tingling, weakness and instability in her lower extremities. (Id.). Plaintiff also complained that she was unable to sit, that she could stand for only fifteen minutes, and walk for five minutes. (Id.). After examining Plaintiff, Dr. Reich reported that Plaintiff suffered from: (1) severe unremitting low back pain; (2) lumbar strain/sprain; (3) sacroiliac joint dysfunction; and (4) status post percutaneous nucleoplasty. (Tr. 225). Dr. Reich's report noted that Plaintiff was 5'10" tall and weighed 220 pounds. (Tr. 224). Dr. Reich explained that Plaintiff's bilateral SI joint pain arose from "lack of conditioning and endurance training and carrying too much" weight, but noted that surgical intervention was "not an effective treatment option" at the time of the evaluation. (Tr. 225). Instead, Dr. Reich recommended "an aggressive home exercise" program focusing on "lumbar spine and abdominal spine stabilization," and a weight loss program. (Id.).

On May 21, 2007, Dr. Nithyashuba Khona, a consultative physician, examined Plaintiff. (Tr. 180-82). Plaintiff reported to Dr. Khona that she suffered a back injury when she dropped a fifty-pound bag of frozen spinach and fell on her back while working as a cook in a hospital.

5

(Tr. 180).  Due to that injury, Plaintiff reported that she felt "a pressure, stabbing pain in her back," that was "dull[] all the time."  (Tr. 180).  Dr. Khona reported "very minimal physical finding[s]" and diagnosed Plaintiff with a "history of lumbar sprain/strain with chronic pain in the back."  (Tr. 181).  Dr. Khona observed that Plaintiff's gait was normal; she could walk on her toes and heals without difficulty and could "squat half way through."  (Tr. 181).  In addition, Plaintiff had full range of motion in her shoulders, elbows, forearms, wrists and fingers bilaterally.  (Id.).  Plaintiff's cervical spine exhibited full range of motion and no tenderness or trigger points.  (Id.).  Dr. Khona reported "exaggerated tenderness in [Plaintiff's] back with the slightest touch."  (Id.).  Dr. Kona also noted that during the evaluation, Plaintiff had well-pedicured feet, "with airbrush painting done on the toenails, which requires prolonged sitting and elevation of the legs to about 90 degrees in a seated position for a prolonged time."  (Id. 181-82).

On June 1, 2007, Plaintiff underwent an x-ray of her lumbar spine.  (Tr. 185).  The x-ray revealed slight scoliosis convex, with slight disc space narrowing at L5-S1.  (Id.).  Subsequently, on August 15, 2007, an x-ray of Plaintiff's right knee was taken.  (Tr. 285).  The x-ray results were negative.  (Id.).  Specifically, the examining physician noted that there was "no joint effusion" and there were "no articular or osseous abnormalities."  (Id.).  On June 19, 2009, x-rays of Plaintiff's lumbar spine were taken.  (Tr. 259).  Those x-rays revealed that Plaintiff had minor narrowing of the L5-S1 disc space and minimal levoscoliosis.  (Id.).

Dr. Joseph Udomsaph, a state agency medical consultant, reviewed Plaintiff's medical record on June 1, 2007.  (Tr. 186-93).  Based on his observations, Dr. Udomsaph concluded that Plaintiff could lift twenty pounds occasionally, lift ten pounds frequently, stand and/or walk six hours during an eight-hour workday, and sit for a total of six hours in an eight-hour workday.

(Tr. 187). Moreover, Dr. Udomsaph determined that Plaintiff's ability to push and/or pull was only limited by her ability to lift and/or carry. (Id.).

On November 20, 2007, Dr. Ralph Cataldo, a pain management specialist, examined Plaintiff at the request of Plaintiff's attorney. (Tr. 242-44). During the examination, Plaintiff complained of: (1) pain in her lower back, buttocks, and legs; (2) stiffness in her back when waking in the mornings; (3) aggravated back pain while stooping, kneeling, and squatting; (4) loss of sleep due to back pain and leg spasms; (5) back pain caused by lifting and carrying objects, and prolonged sitting; (6) back spasms caused by sneezing; (7) anxiety due to residual right leg and foot numbness; and (8) pain while performing house chores and wearing high heels. (Tr. 242). Dr. Cataldo observed muscle spasms and severe tenderness of the paravertebral musculature. (Tr. 243). In addition, Plaintiff's lumbar spine exhibited limited range of motion. (Id.). Plaintiff also exhibited severe interspinous tenderness at the L3-4, L4-5, L5-S1 interspaces, and severe tenderness at both sacrosciatic notches. (Id.). However, Dr. Cataldo noted that a neurologic examination of Plaintiff's lower extremities revealed that her deep tendon reflexes were intact and equal bilaterally, and that she experienced no sensory loss, muscle weakness, or atrophy. (Id.). Based upon his observations, Dr. Cataldo concluded that Plaintiff had a ninety-five percent "partial total" disability based on the increased residuals of a herniated nucleus pulposus at L5-S1, a bulging annulus at the L3-L4 and L4-L5 levels with sciatic neuralgia status-post multiple pain management procedures, and status-post percutaneous nucleoplasty of the lumbar spine. (Tr. 243-44).

Dr. Khona re-examined Plaintiff on June 17, 2009. (Tr. 255-58). Plaintiff complained of chronic neck, shoulder, leg, hand, wrist and lower back pain. (Tr. 255). Dr. Khona observed that Plaintiff had a normal gait, could walk on her toes and heels without difficulty, did not need

7

help getting on and off the changing table, and could rise from a chair without difficulty. (Tr. 257). Plaintiff also exhibited full range of motion in her hips, knees and ankles bilaterally. (Id.). Moreover, Plaintiff's hand and finger dexterity were intact, and her grip strength was 5/5 bilaterally. (Id.). Plaintiff had full flexion, extension, and lateral flexion bilaterally in her cervical spine, and full range of motion in her shoulders, elbows, forearms, wrists, and fingers bilaterally. (Id.). Straight leg raising tests in the seated and the supine positions were negative bilaterally. (Id.). Plaintiff could not do a squat, and refused to do a spinal flexibility test beyond twenty degrees. (Id.).

Based upon his observations, Dr. Khona concluded that Plaintiff "had minimal physical findings." (Id.). Dr. Khona reported that although Plaintiff refused to do spinal flexibility beyond twenty degrees, she could bend over and pull up her pants. (Id.). Based upon Plaintiff's conduct during the examination, Dr. Khona noted that Plaintiff's complaints seemed to be exaggerated. (Id.). Dr. Khona also noted that Plaintiff worked until 2006, and then resigned for personal reasons unrelated to her physical pain. (Id.). Finally, based on Dr. Khona's observations, he noted that Plaintiff "may be malingering." (Id.).

On June 17, 2009, Dr. Khona conducted an assessment of Plaintiff's ability to do work-related activities. (Tr. 262). Dr. Khona assessed that Plaintiff could: (1) lift and carry ten pounds; (2) sit for four hours during an eight-hour workday; (3) stand for two hours during an eight-hour workday; and (4) walk for one hour during an eight-hour workday. (Tr. 263). Dr. Khona also determined that Plaintiff could: (1) reach in all directions with both hands, (Tr. 264); (2) handle objects, finger, feel, push, and pull, (id.); and (3) operate foot controls with either foot, (Tr. 266). Moreover, Plaintiff could frequently climb stairs, ramps, ladders, and scaffolds, and occasionally stoop, kneel, crouch, and crawl. (Tr. 266). Finally, Plaintiff could shop, travel

8

independently, ambulate without using an assistive device, walk one block at a reasonable pace on a rough or uneven surface, use standard public transportation, climb a few stairs with the use of a single handrail, prepare a simple meal, conduct personal hygiene, and sort, handle, and use paper. (Tr. 268).

## II.     STANDARD

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)). If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360). The district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277,

284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978))). Furthermore, evidence is not substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

### III.   DISCUSSION

To qualify for DBI, a claimant must establish that he is disabled. 42 U.S.C. § 423(a)(1)(E). A claimant is disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairment(s) must prevent him not only from doing his previous work, but also from "engag[ing] in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; see Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004). The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Such activity bars the receipt of benefits. 20 C.F.R. § 404.1520(a). The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

If the Commissioner finds that the claimant's condition is severe, the Commissioner determines whether it meets or equals a listed impairment. 20 C.F.R. § 404.1520(d). If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues to step four to evaluate the claimant's residual functional capacity ("RFC") and analyze whether the claimant's RFC would enable the claimant to return to his "past relevant work." 20 C.F.R. § 404.1520(e). The ability to return to past relevant work precludes a finding of disability. If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work "in significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).

Here, the ALJ concluded that Plaintiff met the insured status requirements of the Act through December 31, 2010. (Tr. 12). The ALJ then conducted the five-step inquiry, and found that Plaintiff was not disabled within the meaning of the Act. (Tr. 10). First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 6, 2006 – the alleged onset of her disability. (Tr. 12). Second, the ALJ examined Plaintiff's medical records and found that Plaintiff suffered from the following severe impairments: lower back pain, and weakness and numbness in both legs. (Id.). Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met the requirements for impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.). Fourth, the ALJ determined that Plaintiff had the RFC necessary to perform a variety of jobs. (Tr. 13). In particular, the ALJ found that Plaintiff had the ability to "lift and carry 10 pounds occasionally and frequently; sit for 6 hours; and stand/walk for at least 2 hours[] in an 8-hour workday." (Tr. 15). The ALJ also found that Plaintiff had the RFC necessary to climb, stoop, balance, crouch, and kneel. (Id.).

11

Fifth, the ALJ found that Plaintiff was capable of performing her past relevant work as an administrator, and was thus ineligible for benefits.  (Id.).

### A. Whether the ALJ Failed to Properly Evaluate and Weigh All of the Relevant Medical Evidence

Plaintiff argues that the ALJ failed to evaluate all of the relevant medical evidence in the record, and improperly substituted his own judgment for that of Plaintiff's treating physicians.  (Pl.'s Br. at 7).  Specifically, Plaintiff highlights the fact that the ALJ considered the reports of Dr. Khona, Dr. Udomsaph, Dr. Reich, Dr. Cataldo, and Dr. Paz, Jr., but excluded from his opinion, without explanation, the reports of Dr. Shailen Jalali, Dr. Anton Kemps, Dr. Alexander Vaccaro, Dr. Ronald Krasnick, Dr. Linda Brecher, Dr. Irving Ratner, and Dr. Edward Tobe.  (Id. at 8).  In response, the Commissioner argues that the ALJ considered all relevant evidence, and asserts that "most of the medical evidence cited by plaintiff pre-dates January 6, 2006, her alleged onset of disability date."  (Def.'s Br. at 14).  Specifically, the Commissioner points to the medical reports of Drs. Jalali, Kemps, and Tobe, and claims that because the examinations that produced those reports occurred before 2006, they are irrelevant to the ALJ's determination of Plaintiff's disability status after 2006.  Moreover, the Commissioner asserts that the medical examinations of Dr. Brecher, Dr. Ratner, and Dr. Krasnick are not entitled to significant weight.  The Court disagrees.

A district court reviewing findings of fact made by an ALJ is bound by the standard articulated in 42 U.S.C. § 405(g):  "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  In determining whether substantial evidence supports the ALJ's decision, the district court must assess whether the ALJ considered all relevant evidence and explained why it rejected any relevant evidence.  Cotter v. Harris, 642 F.2d 700, 705-707 (3d Cir. 1981).  As the Third Circuit explained in Cotter, the ALJ must

12

provide, "not only an expression of the evidence s/he [sic] considered which supports the result," but also "some indication of the evidence which was rejected." Id. Critically, an ALJ must provide a reason "why probative evidence has been rejected" so that a reviewing court "can determine whether the reasons for rejection were improper." Id. at 707. Thus, an ALJ's failure to explain his decision to implicitly reject relevant evidence, or even acknowledge its presence, is reversible error. Id. at 707.

Here, the Court finds that the ALJ erred by failing to explain why he rejected relevant medical reports in the administrative record. The administrative record contains reports submitted by at least twelve physicians. In the ALJ's opinion, he mentions medical reports from only five of those physicians. Because the ALJ's opinion does not mention a substantial number of the medical reports in the administrative record, the Court cannot determine whether the ALJ rejected those reports for appropriate reasons.

An ALJ's failure to mention medical reports in the administrative record is particularly significant where, as here, some of those reports may support the plaintiff's claim for DBI. Indeed, some of the reports in the administrative record shed light upon the severity of Plaintiff's lower back and right knee pain. For example, with respect to Plaintiff's lower back, on August 3, 2004, Dr. Jalali, Plaintiff's treating physician, reported that Plaintiff "suffers from lumbar degenerative disc disease and disc displacement with radiculitis." (Tr. 199). On July 16, 2004, Dr. Jalali reported that Plaintiff had "a lifting restriction of 5 lbs," and noted that Plaintiff could not "do any type of job that [would] result in any type of lifting beyond 5 lbs or any job that [would] require physical altercation with inmates." (Tr. 202). Those reports conflict with the ALJ's determination that Plaintiff could occasionally and frequently carry ten pounds, yet the ALJ provides no explanation for his decision to discount them. The ALJ's failure to explain why

13

he rejected Dr. Jalali's reports are significant because Dr. Jalali was Plaintiff's treating physician, and a treating physician's medical report is entitled to great weight in a social security benefits eligibility determination.  See Morales, 225 F.3d at 317 (noting that "[w]here . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'") (quoting Plummer, 186 F.3d at 429); id. ("In choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion.") (quoting Plummer, 186 F.3d at 429); Terwilliger v. Chater, 945 F. Supp. 836, 840 (E.D. Pa. 1996) ("Where the findings are those of a treating physician, the Third Circuit has 'long accepted' the proposition that those findings 'must [be] give[n] greater weight . . . than . . . the findings of a physician who has examined the claimant only once or not at all.'") (quoting Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993)).

In addition to Dr. Jalali's medical report, the record contains other medical reports that may be relevant to Plaintiff's claim for DBI.  For example, Dr. Alexander Vaccaro examined Plaintiff on October 17, 2003, and noted that an MRI of Plaintiff's lower back revealed a "decrease in the T2 weighted image intensity at the L5-S1 level, along with a midline to right-sided paracentral disc protrusion."  (Tr. 194).  Dr. Vaccaro also noted that Plaintiff suffered from "severe, unrelenting low back pain."  (Id.).  In addition, Dr. Anton Kemps observed that Plaintiff had a "seven and one-half (7 1/2) partial total disability to the lumbar spine referable to a herniated disc at the L5-S1 level with mild restriction in range of motion in the lumbar spine."  (Tr. 176).  The ALJ's opinion does not address those reports.

Furthermore, the administrative record contains evidence relevant to Plaintiff's knee pain. On January 8, 2008, Dr. Krasnick reported that Plaintiff "has gross lateral tracking of her patella with a positive apprehension sign," and noted that MRI's of Plaintiff's right knee demonstrated "lateral tracking of the patella associated with chondromalacia." (Tr. 247). Dr. Krasnick also noted that Plaintiff was "scheduled for arthroscopic surgery in the form of a chondroplasty and lateral release." (Id.). The ALJ did not address this evidence in his opinion.

Regarding Plaintiff's mental condition, Dr. Edward H. Tobe, a licensed psychiatrist, examined Plaintiff on June 29, 2005. Dr. Tobe observed that during the examination, Plaintiff exhibited "sadness" in her "face and voice" and "talked about her chronic pain and restriction in ability to function." (Tr. 178). Dr. Tobe also observed that Plaintiff exhibited a "mood of depression." (Tr. 178). After assessing Plaintiff's condition, Dr. Tobe stated:

> Ms. Ford has required operative intervention on her low back. She is currently suffering with a chronic low back syndrome. She has not had outpatient psychiatric treatment. I think outpatient psychiatric treatment is warranted and directly related to her work injury. Such treatment is potentially curative in nature, although a trial of such treatment is required to fully assess whether or not such would occur. Without a trial of outpatient psychiatric treatment directly related to her work injury, there is a dysthymic disorder and pain disorder associated to both psychological features and her general medical condition causing a 25% permanent of [sic] total psychiatric disability. This estimate of psychiatric disability is based on objective medical findings and does materially impair the ordinary pursuits of her life.

(Tr. 178-79). The ALJ failed to mention Dr. Tobe's report, but rejected Plaintiff's testimony concerning her psychological condition.

The Commissioner's contention that most of the medical evidence that the ALJ failed to discuss in his opinion is irrelevant because it pre-dates January 6, 2006 is unpersuasive. Although Plaintiff stated that she became disabled in January 6, 2006, the cause of Plaintiff's

15

disability was an injury she sustained in 1999.  Any medical report that describes the nature and extent of Plaintiff's back condition after 1999 is at least <u>relevant</u> to the Court's assessment of Plaintiff's disability claim.

Moreover, the <u>Commissioner's</u> argument that the Court should not give substantial weight to the medical reports of Dr. Brecher, Dr. Ratner, and Dr. Krasnik misses the point.  In effect, the Commissioner invites the Court to examine the medical reports the ALJ failed to consider in reaching his final decision, and conduct an independent assessment of whether those reports support the ALJ's conclusion.  However, as previously mentioned, in determining whether the ALJ's decision is supported by substantial evidence, the district court may not weigh the medical evidence "or substitute its conclusions for those of the fact-finder." <u>Williams</u>, 970 F.2d at 1182.  Here, Defendant's argument that the medical reports of Dr. Brecher, Dr. Ratner, and Dr. Krasnick are not entitled to significant weight misses the point because Plaintiff's principal contention is that the ALJ <u>failed to consider all relevant evidence</u>; not whether the evidence itself supports the ALJ's decision to deny Plaintiff benefits.  It is not the proper role of the Court to assess whether the evidence that the ALJ <u>did not</u> consider supports the ALJ's final decision.  Instead, the district court must determine whether the ALJ properly considered all relevant evidence and whether that evidence supports the ALJ's determination.

In sum, the Court finds that the ALJ erred by failing to articulate why it rejected some of the relevant medical evidence in the administrative record.  <u>See</u> <u>Mathews</u>, 574 F.2d at 776 ("'[U]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'") (quoting <u>Arnold v. Sec'y of HEW</u>,

16

567 F.2d 258, 259 (3d Cir. 1977)). Therefore, the Court remands this matter to the ALJ to consider all of the relevant medical reports in the administrative record. See 42 U.S.C. § 405(g) (providing that a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security . . . ."). The Court notes that, on remand, the ALJ may reach the same conclusion regarding Plaintiff's claim for DBI. However, should the ALJ decide to reject relevant medical reports, the ALJ must provide an explanation why it rejected evidence relevant to Plaintiff's claimed disability.

## II.   CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's failure to explain why it rejected relevant medical reports constitutes reversible error. As a result, the Court will vacate the ALJ's decision, remand the matter to the ALJ for further proceedings consistent with this Opinion, and deny Plaintiff's motion for summary judgment. See Reefer v. Barnhart, 326 F.3d 376, 381-82 (3d Cir. 2003) (explaining that remand is appropriate where there is a need for ALJ to explain why he relied on certain evidence and rejected other evidence); Podedworny v. Harris, 745 F.2d 210, 221-22 (3d Cir. 1984) (noting that court should order award of benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits"); Perrone v. Barnhart, No. 07-1367, 2009 WL 742727, at *7 (D.N.J. Mar. 16, 2009) (denying plaintiff's motion for summary judgment upon finding that ALJ failed to explain why he relied on certain evidence and rejected other evidence).

Dated:  7/28/2011                                                                              /s/ Robert B. Kugler
                                                                                                                                  ROBERT B. KUGLER
                                                                                                                                   United States District Judge